IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JENNIFER ELAINE LANIER,            )
                                   )
          Plaintiff,               )
                                   )        CIVIL ACTION FILE NO.
vs.                                )
                                   )        1:06-CV-0522-GET
DOUGLAS R. BESS, M.D.,             )
GEORGIA DEPARTMENT OF              )
CORRECTIONS, METRO STATE           )
PRISON, MHM CORRECTIONAL           )
SERVICES, INC. and GEORGIA         )
CORRECTIONAL HEALTHCARE,           )
                                   )
          Defendants.              )

## DEFENDANTS MHM AND BESS' BRIEF IN SUPPORT OF THEIR MOTION TO STRIKE THE TESTIMONY OF PLAINTIFF'S EXPERT MATTHEW NORMAN, M.D.

COME NOW MHM CORRECTIONAL SERVICES, INC. and DOUGLAS R. BESS, M.D., named defendants in the above-captioned case, and herein file and serve their brief in support of their motion to strike the testimony of plaintiff's expert Matthew W. Norman, M.D., respectfully showing the Court as follows:

This suit involves plaintiff's allegation that Dr. Bess and his employer, MHM Correctional Services, Inc. ("MHM") committed medical negligence and violated her Eighth Amendment rights when making certain specific decisions about medication dosage and combinations. The sole support for plaintiff's claims of a

violation of the standard of care and causation are the opinions of Matthew Norman, M.D.

However, under both the new Georgia statute governing admissibility of expert opinions and the dictates of the Supreme Court, as set forth in <u>Daubert</u>, Dr. Norman is barred from providing testimony in this case. First, Dr. Norman is not qualified to render opinions because, during the time period at issue in this case, he had just finished training and had not been in active practice for three of the last five years. Second, Dr. Norman's opinions are neither reliable nor relevant under <u>Daubert</u>. As such, in its role as the gatekeeper of scientific information, the Court should strike Dr. Norman's testimony.

## I.    STATEMENT OF FACTS

### A.    <u>The Facts Giving Rise to Plaintiff's Claims</u>

Plaintiff was first incarcerated at Metro State Prison ("Metro") on September 9, 2002. Another physician, who is not a party to the suit, initially prescribed plaintiff a 20 mg oral dose of Haldol, an anti-psychotic drug, due to plaintiff's severe psychotic episodes. (Bess depo. at 64).

After Dr. Bess took over plaintiff's care, he continued to prescribe the same dosage of oral Haldol. (Id. at 71). Plaintiff often refused to take her medication, which resulted in a lack of progress in her severe psychotic episodes. (Id.)

After discussing the matter with the entire treatment team at Metro, Dr. Bess began to prescribe a long acting form of injectable Haldol[1] in addition to the oral Haldol. (Id. at 75). During October and November 2002, Dr. Bess ordered increased dosages of Haldol decanoate while continuing to prescribe the same dosage of oral Haldol. (Id. at 85, 89, 93).

On December 8, 2002, after plaintiff developed a high fever, she was hospitalized and was diagnosed with Neuroleptic Malignant Syndrome ("NMS"), a rare but potentially life-threatening condition.

Plaintiff claims that Dr. Bess' decision to increase in dosage of Haldol decanoate, in addition to her current dosage of oral Haldol, caused her to develop NMS. Plaintiff asserts that NMS required her to be hospitalized and has resulted in continued physical defects. Her claim against MHM is based on *respondeat superior* for the actions of Dr. Bess. The sole

---

[1] Long acting intramuscular Haldol also is referred to in the depositions as injectable Haldol, Haldol-decanoate, or Haldol-dec.  For consistency, this brief only uses the term "Haldol decanoate."

medical support for plaintiff's claims against MHM and Dr. Bess is the testimony of Dr. Norman. (Complaint).

**B.   Dr. Norman's Background Shows He is Not Qualified to Render Opinions in this Case**

The parties agree that the timeframe at issue in plaintiff's suit is September through December 2002. (Norman depo. at 44). At that time, Dr. Norman had just finished his fellowship and had just begun actual medical practice.

Dr. Norman's *curriculum vitae* ("CV") shows that he graduated from the Mercer University School of Medicine in 1997. (Norman depo. at Exhibit 1, p. 2). From 1997 to 2001, he was a psychiatry resident at Emory University School of Medicine. (Id.)  From 2001 to 2002, he was a Forensic Psychiatry Fellow at Emory University School of Medicine. (Id.) In July 2002, Dr. Norman entered active medical practice, in which he currently is engaged. (Id. at p. 1).

From July 2002 until the present, Dr. Norman also has performed as a Clinical Assistant Professor at Emory University School of Medicine's Department of Psychiatry and Behavioral Science. (Id.) In November 2002, Dr. Norman became board certified in psychiatry. (Norman depo. at 11). Dr. Norman, therefore, had just entered active practice when Dr. Bess

committed his alleged acts of negligence in this case between September and December 2002.

In his career, Dr. Norman has diagnosed five or less people with NMS, and those cases occurred during his residency. (Id. at 14). Dr. Norman has not published or lectured on NMS, nor has he diagnosed or treated additional patients with NMS since his residency. (Id. at 12, 14).

**C.   Dr. Norman's Opinions are Neither Reliable Nor Relevant**

Plaintiff has proffered Dr. Norman as an expert in NMS, but this is an area that even Dr. Norman admits is beset with medical uncertainty. Yet Plaintiff attempts to find fault with Dr. Bess's decision to administer an increased dosage of Haldol.

Dr. Norman refused to criticize Dr. Bess' initial decision to continue prescribing 20 mg oral Haldol to plaintiff or his later decision to prescribe 50 mg Haldol decanoate in addition to the 20 mg oral Haldol. (Id. at 74-76, 86). Dr. Norman also declined to opine whether an increased dosage of Haldol decanoate, by itself, whether at a dose of 50, 100, 150 or 200 mg, would have been an appropriate dose for plaintiff. (Id. at 76-77, 85-86). Rather, Dr. Norman criticized Dr. Bess' decision to increase the dosage of Haldol decanoate above 50 mg while

continuing the same 20 mg dosage of oral Haldol. (Id. at 74-78, 94-95, 158).

Confusion exists in Dr. Norman's testimony on what particular dosage of Haldol decanoate he believes caused plaintiff to develop NMS. At first, he stated that he was critical of Dr. Bess's increasing the dose of Haldol decanoate from 50 to 100 mg while continuing the 20 mg oral Haldol. (Id. at 76-78). Later, Dr. Norman testified that Dr. Bess should only have discontinued the 20 mg oral Haldol sometime between the change from the 100 to the 150 mg dose of the Haldol decanoate. (Id. at 84-85).

Dr. Norman's causation opinion, which he asserts is supported by a couple of unnamed articles, is that a higher dose of neuroleptic, especially Haldol, increases the risk of a person developing NMS. (Id. at 34, 88-89, 95). However, in a deposition in a prior case in 2004, Johnson v. MHM et al., Dr. Norman admitted that NMS has not been related to a particular dosage of drugs.[2] (Deposition of Matthew W. Norman, M.D., dated Apr. 2, 2004 (the "2004 Norman Depo."), at 91). And in this case, Dr. Norman admitted that controversy exists on whether NMS

---

[2]Defendants have not yet obtained a second original of this 2004 deposition transcript. Therefore, for the time being, they have filed a copy of the deposition and will supplement the record with a sealed original.

is related to a particular dose of neuroleptic. (Norman depo. at 34).

Dr. Norman further admitted that he could not ascertain the particular dosage of Haldol that allegedly caused plaintiff to develop NMS, even when Dr. Bess increased the dosage of Haldol decanoate to 150 mg. (Id. at 88-89). In addition, Dr. Norman agreed that NMS is a rare occurrence and he was unable to opine on the exact date when plaintiff developed NMS. (Id. at 31, 90).

Dr. Norman stated that a patient can develop NMS from a drug she has taken successfully for a substantial amount of time. (Id. at 32). Thus, Dr. Norman testified that NMS is hard to diagnose because someone can take a drug for years without incident and then suddenly develop NMS from the same medication. (Id. at 32-33). He further recognized that a person who develops NMS from a particular neuroleptic actually can be put back on that same medication as long as she is monitored closely. (Id. at 35). Dr. Norman further opined that NMS is not related to a particular neuroleptic medication. (Id. at 34).

## II.  ARGUMENT AND CITATION OF AUTHORITY

In ruling on the admissibility of expert testimony since Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993), courts engage in a two-part analysis: (1) whether

the expert is qualified to render an opinion on the standard of care (the competency component), and (2) "whether the expert's causation theory meets the strictures of [Fed.R.Evid.] 702." McDowell v. Brown, 392 F.3d 1283, 1295 (11th Cir. 2004). The burden of laying a proper foundation for the admission of expert testimony is on the party offering the expert: in this case, plaintiff.  See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Plaintiff must show admissibility by a preponderance of the evidence. Id.

As set forth below, plaintiff cannot meet her burden in this case because Dr. Norman is not qualified to render his opinion, and his testimony does not meet the requirements of Rule 702, as explained by the standard set out in Daubert. Therefore, the Court should exercise its role as the gatekeeper and exclude Dr. Norman's testimony in this case.

A.    **As a Matter of Law, Dr. Norman Is Not Qualified To Testify Because He Does Not Have the Requisite Qualification or Experience**

Before examining the admissibility of expert testimony under Fed.R.Evid. 702, the court must address whether the expert is qualified to testify competently on the matters he intends to address. Allison, 184 F.3d at 1309. Because Plaintiff has brought state law medical negligence claims against Dr. Bess (and against MHM through *respondeat superior*), the issue of Dr.

Norman's qualification as an expert is based on Georgia substantive law. McDowell, 392 F.3d at 1294-95; Dukes v. Georgia, 428 F. Supp. 2d 1298, 1311, 1313 (N.D. Ga. 2006).

The applicable Georgia law on admissibility of expert opinions in professional medical malpractice actions is found at O.C.G.A. § 24-9-67.1. In pertinent part, O.C.G.A. § 24-9-67.1(c) states:

> [I]n professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible **only if, at the time the act or omission is alleged to have occurred**, such expert:
>
> (1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and
>
> (2) In the case of a medical malpractice action, **had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given** as the result of having been regularly engaged in:
>
> (A) **The active practice of such area of specialty of his or her profession for at least three of the last five years**, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or
>
> (B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational

> institution accredited in the teaching of such
> profession, with sufficient frequency to establish
> an appropriate level of knowledge, as determined
> by the judge, in teaching others how to perform
> the procedure, diagnose the condition, or render
> the treatment which is alleged to have been
> performed or rendered negligently by the defendant
> whose conduct is at issue; and
>
> . . .

(emphasis added). The clear intent of this code section, therefore, is to limit opinions in medical malpractice actions to those persons who were actively engaged in the practice of a similar type of medicine during three of the five years **preceding** the alleged negligent acts of the defendants. See also O.C.G.A. § 24-9-67.1(c)(2)(D) ("an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred . . . .").

Although O.C.G.A. § 24-9-67.1 became effective on February 16, 2005, and the conduct complained of in this case occurred in late 2002, this statute governs the admissibility of expert opinions in this case. Dukes, 428 F. Supp. 2d at 1311-12 [applying O.C.G.A. § 24-9-67.1 to expert testimony about acts occurring in 2001 and stating that the Georgia legislature intended this law to apply to "causes of action pending on [the law's] effective date"].

Applying O.C.G.A. § 24-9-67.1 to this case, it is clear that Dr. Norman is not qualified to render expert opinions about the care provided in fall 2002 by Dr. Bess. The alleged acts of negligence against Dr. Bess concern his Haldol prescription decisions in September through November 2002. Dr. Norman, however, did not enter active medical practice until just before this time, in July 2002. (Norman depo. at Exhibit 1, p. 1). Dr. Norman's experience of two months' active practice, therefore, falls far short of the statutory requirement that he be engaged in active practice for three of the last five years preceding Dr. Bess's alleged negligent treatment. O.C.G.A. § 24-9-67.1(c)(2)(A). Dr. Norman simply cannot meet that requirement because he was a student until 1997 and a resident until 2001.

Furthermore, Dr. Norman did not become board certified in psychiatry until November 2002. (Norman depo. at 11). Similarly, since Dr. Norman only began teaching at Emory in July 2002, a mere two months before the events of this lawsuit began, he cannot qualify under the teaching option. O.C.G.A. § 24-9-67.1(c)(2)(B).

Additionally, under O.C.G.A. § 24-9-67.1(c)(2)(A), Dr. Norman does not have frequent enough experience diagnosing and treating NMS to be considered an expert in this field. First, Dr. Norman has diagnosed five or less people with NMS, and those

cases occurred during his residency, which ran from 1997 to 2001. (Norman depo. at 14). Second, Dr. Norman has not diagnosed or treated additional patients with NMS since his residency, and he has not published or lectured on NMS. (<u>Id</u>. at 12, 14).

Both Dr. Norman's qualifications and experience fall far short of those required by Georgia law for physicians providing opinions against other physicians. Dr. Norman, thus, is not qualified to render opinions about Dr. Bess's conduct in this case, and an order striking his testimony in its entirety is appropriate.

**B.    Under _Daubert_, Dr. Norman's Opinions Fail Both the Reliability and Relevancy Requirements**

Even if the Court were to consider Dr. Norman a qualified expert witness, his causation opinion, i.e., that plaintiff developed NMS because Dr. Bess increased the dosage of Haldol decanoate while maintaining the dosage of oral Haldol, does not meet the admissibility requirements of Fed.R.Evid. 702, as explained by <u>Daubert</u>. <u>See</u> <u>McDowell</u>, 392 F.3d at 1297-98.

Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has
applied the principles and methods reliably to the
facts of the case.

In Daubert, the Supreme Court cautioned that district court
judges are to act as gatekeepers who "ensure that any and all
scientific testimony or evidence is not only relevant, but
reliable." Daubert, 509 U.S. at 589, 113 S.Ct. at 2795 (emphasis
added). "The judge's role is to keep unreliable and irrelevant
information from the jury because of its inability to assist in
the factual determinations, its potential to create confusion,
and its lack of probative value." Allison, 184 F.3d at 1311-12.

Along with the plaintiff's burden to produce a qualified
expert, plaintiff here also bears the burden of showing that her
expert's opinion is relevant and reliable. United States v.
Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), cert.
denied, 544 U.S. 1063 (2005). As set forth below, plaintiff
cannot show that Dr. Norman's causation opinion is either
reliable or relevant.

### 1.   Dr. Norman's Causation Opinion is not Reliable

Under Daubert's reliability element, the Court must assess
"whether the reasoning or methodology underlying the testimony
is scientifically valid and . . . whether that reasoning or
methodology properly can be applied to the facts in issue."
Frazier, 387 F.3d at 1261-62 (quoting Daubert, 509 U.S. at 592-

93, 113 S.Ct. at 2796). In making this assessment, the Court considers issues such as: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *Id.* at 1262 (citation omitted).

In the instant case, Dr. Norman's causation opinion on NMS falls short on all the reliability factors and amounts to improper speculation. Dr. Norman claims that the increased dosage of Haldol decanoate, combined with the existing dosage of oral Haldol, caused plaintiff to develop NMS. (Norman depo. at 34, 88-89, 95; Complaint at Norman Aff. ¶¶ 7(e-f), 8(e-f), 9). Dr. Norman's theory on causation boils down to, in effect, that "the greater the dosage, the greater the risk of developing NMS." But in neither his affidavit nor his deposition testimony does Dr. Norman provide substantive support for *why* the Court should deem his statements sufficiently reliable.

Dr. Norman stated at his deposition that his opinion linking causation of NMS to increased dosages of Haldol decanoate is based only on "a couple of articles." (Norman depo. at 34). Dr. Norman could not recall the titles or authors of the articles or the journals in which they were published. (Id. at

34-35). All Dr. Norman could recall was that the article came out "sometime before [he] finished residency" in 2001. (Id. at 35). Dr. Norman further admitted that he did not perform a literature search specific to this case. (Id. at 11).

Additionally, Dr. Norman has not lectured or published articles on NMS. (Id. at 12). Neither his testimony nor his CV indicates that he has participated in any clinical studies related to his causation theory.

Dr. Norman's affidavit sheds no further light on how he formulated his causation opinion. Instead, his affidavit only offers general statements that he is a specialist in forensic psychiatry, that he is experienced in correctional facility mental health care, that he teaches correctional psychiatry, that he reviewed plaintiff's complete correctional mental health and medical records and that he based his opinions on these records, as well as his professional training, practice and his knowledge of standards and criteria. (Complaint at Norman Aff. ¶¶ 1-4). Dr. Norman's affidavit "makes no reference to any specific experience or material upon which he relied in making his conclusions." Dukes, 428 F. Supp. 2d at 1314-15.

Additionally, to the extent that Dr. Norman bases his causation opinion on his own experience in treating NMS, he admits that he only has diagnosed five or less people with NMS,

and that he has not diagnosed or treated *any* cases since his residency, which ended in 2001. (Norman depo. at 14). Notably, nothing in the record shows that Dr. Norman's treatment of these few patients involved his theory that increased dosages of Haldol equates to the development of NMS. In other words, Dr. Norman has not explained *how* his experience leads to his conclusion on causation or *why* his experience is a sufficient basis for his opinion. <u>Frazier</u>, 387 F.3d at 1261 (citing Committee Note to 2000 Amendment to Rule 702).

Furthermore, Dr. Norman agrees that controversy exists on whether NMS is related to a particular dose of neuroleptic. (Norman depo. at 34). He even admitted in a previous deposition that NMS has not been related to a particular dosage of drug. (2004 Norman depo. at 91). Dr. Norman also testified that he could not ascertain the particular dosage of Haldol that allegedly caused plaintiff to develop NMS, even when Dr. Bess increased the dosage of Haldol decanoate to 150 mg. (Norman depo. at 88-89). In addition, Dr. Norman was unable to opine on the exact date when plaintiff developed NMS. (<u>Id</u>. at 31, 90).

Dr. Norman's testimony also reveals that NMS is a mysterious, rare and difficult-to-diagnose condition, thus casting further doubt on his opinion on how it developed in plaintiff. Dr. Norman stated that a patient can develop NMS from

a drug she has taken successfully for a substantial amount of time. (Id. at 32). Dr. Norman admitted that someone can take a drug for years without incident and then suddenly develop NMS from the same medication. (Id. at 32-33). He further recognized that a person who develops NMS from a particular neuroleptic actually can be put back on that same medication as long as she is monitored closely. (Id. at 35).

Dr. Norman's causation opinion, thus, is based only on his review of a couple of unidentified articles by unknown persons and his own limited experience in treating less than five cases of NMS. What *is* known in this case is that Dr. Norman neither has tested his theory, nor has he determined an error rate associated with it. McDowell, 392 F.3d at 1300. Under the four Daubert reliability factors, this is clearly not enough.

It is impossible on this record for the Court to determine the methodology, the techniques used in testing the theory relied upon by Dr. Norman, the sort of review process the theory has undergone, the known or possible error rates of the techniques used and the data used. In other words, Dr. Norman offered no "hard information" concerning the rates of incidence of NMS in patients whose dosages of Haldol decanoate had been increased in the same manner as had plaintiff's dosages. Frazier, 387 F.3d at 1265.

Moreover, Dr. Norman admitted that his theory about increased dosages of Haldol equating to the development of NMS is controversial. Thus, his theory is not generally accepted in the scientific community. Id. at 1262 (listing Daubert reliability factors).

Simply put, the record shows that, at best, Dr. Norman based his NMS causation theory on nothing more than the contents of a couple unknown articles about an issue that he admits is far from settled. Dr. Norman did not have sufficient data or information in order to form a reliable opinion on how Dr. Bess's increase of the Haldol dosage somehow caused plaintiff to develop NMS. Under these circumstances, Dr. Norman's causation opinion of "the greater the dosage, the greater the risk" amounts to little more than "unscientific speculation." Allison, 184 F.3d at 1316-17 (citations omitted).

In essence, Dr. Norman asks the Court to take a "leap of faith" and rely on his "ipse dixit and assurance that his testimony is based on nationally accepted standards." Dukes, 428 F. Supp. 2d at 1315. Such reliance is forbidden and would ignore Daubert's reliability requirement.

###### 2.   Dr. Norman's Causation Opinions are not Relevant

The final requirement for admissibility of expert opinion testimony is that it must assist the trier of fact in understanding the evidence. <u>Frazier</u>, 387 F.3d at 1266. The proposed expert testimony must be "relevant to the task at hand, i.e., that it logically advances a material aspect of the proposing party's case." <u>Daubert v. Merrell Dow Pharm., Inc</u>., 49 F.3d 1311, 1315 (9th Cir. 1995)(on remand).

In the instant case, Dr. Norman's opinion is unspecific, imprecise and based on unknown methodology in an area of medical controversy. He admitted that he could not ascertain the particular dosage of Haldol that allegedly caused plaintiff to develop NMS. (Norman depo. at 88-89). He was unable to opine on the exact date when plaintiff developed NMS. (<u>Id</u>. at 31-32, 90). He did not even testify consistently on the dosage of Haldol decanoate that he thought fell below the applicable standard of care. (<u>Id</u>. at 76-78, 84-85).

Yet, Dr. Norman opined that some increased dosage of Haldol decanoate combined with the dosage of oral Haldol must have caused plaintiff to develop NMS.  This theory is too vague and unsupported in the record to assist the trier of fact. Moreover, given the lack of evidence on the methodological foundation and reliability of Dr. Norman's causation theory, his opinion easily

could mislead or confuse a jury. <u>Frazier</u>, 387 F.3d at 1263, 1266 (citing Fed.R.Evid. 403).

In essence, Dr. Norman's opinion "offers nothing more than what lawyers for the parties can argue in closing arguments." <u>Frazier</u>, 387 F.3d at 1262-63. Because Dr. Norman's causation opinion based on increased Haldol decanoate dosage does not help the jury, it is not relevant and should be excluded under Rule 702.

For the foregoing reasons, defendants Bess and MHM respectfully request that the Court exclude the testimony of Dr. Norman.

This <u>3rd</u> day of August, 2006.

**CRUSER & MITCHELL, LLP**


<u>s/Dean Simon-Johnson</u>
Deana Simon-Johnson
Georgia Bar No. 646925
Counsel for defendants MHM and
Bess

Peachtree Ridge, Suite 750
3500 Parkway Lane
Norcross, GA 30092
(404) 881-2622 (Telephone)
(404) 881-2530 (Facsimile)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day electronically filed **DEFENDANTS MHM AND BESS' BRIEF IN SUPPORT OF THEIR MOTION TO STRIKE THE TESTIMONY OF PLAINTIFF'S EXPERT MATTHEW W. NOMRAN, M.D.** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorney of record:

Adrienne P. Hobbs      Dave Stubins
Scott Halperin          Department of Law
Hobbs & Halperin       40 Capitol Square
235 Peachtree Street   Atlanta, GA 30334
#400
Atlanta, GA 30303

This 3rd day of August, 2006.

                           **CRUSER & MITCHELL, LLP**

                           s/Dean Simon-Johnson____
                           Deana Simon-Johnson